**In the Matter of the Claims Against the GRAIN BUYER'S BOND NO. 877706–08624237, Thomas D. French, d/b/a French Grain Co., Principal, Auto–Owners Insurance, Surety.**

No. C9–91–2373.

Court of Appeals of Minnesota.

June 16, 1992.

---

James A. Reding, Sylvia Ivey Zinn, Reding & Votel, St. Paul, for relator.

Hubert H. Humphrey, III, Atty. Gen., Paul A. Strandberg, Special Asst. Atty. Gen., St. Paul, for respondents.

Considered and decided by DAVIES, P.J., and SHORT and MULALLY,* JJ.

## OPINION

DAVIES, Judge.

The Minnesota Commissioner of Agriculture allowed as timely the claims of two grain sellers against a grain buyer's bond issued by Auto–Owners Insurance Company, thus entitling the sellers to relief under Minn.Stat. § 223.17, subd. 7 (1990). Auto–Owners challenges the Commissioner's decision. We reverse.

---

* Retired judge of the district court, acting as judge of the Court of Appeals by appointment    pursuant to Minn. Const. art. VI, § 2.

## FACTS

Under Minn.Stat. § 223.17, subd. 8(a) (1990), a grain buyer must obtain a bond to compensate the seller for loss caused by the buyer's failure to pay the contract price. Pursuant to that section, relator Auto–Owners wrote a $30,000 grain buyer's bond for Thomas D. French, d/b/a French Grain Company.

Michael Wallace, a grain producer, sold to French grain worth $25,212.89 in multiple shipments from February through March 1990. Wallace did not enter into a written contract with French for an extension of credit. French made payments to Wallace from February through August 1990, leaving a balance due of $11,696.82.

James Quigley, another grain producer, made four sales of grain to French from March through April 16, 1990. The amounts still unpaid total $9,186.62. Like Wallace, Quigley did not enter into a written contract with French for an extension of credit.

Quigley called French regularly from May through December 1990 demanding payment. Wallace called French approximately twice a week through the summer and fall of 1990 demanding payment. French continually reassured Quigley and Wallace that they would be paid in full. Wallace and Quigley realized that they were not going to be paid when French filed for bankruptcy in December 1990.

Under the bonding statute there are two kinds of grain sales: (1) cash sales, where payment is required to be contemporaneous with the sale; and (2) "voluntary extension of credit sales." Under the first transaction, the grain seller is allowed to claim on the bond. Extension of credit contracts leave the grain producer unprotected by the bond.

On December 24, 1990, Quigley filed a claim with the Department of Agriculture against French's bond, pursuant to Minn. Stat. § 223.17, subd. 7, asserting he had made a cash sale. Wallace filed a similar claim on December 26, 1990. In a letter dated April 23, 1991, the Department told Auto–Owners that the two claims were valid and directed Auto–Owners to pay Wallace and Quigley. Auto–Owners requested a hearing to appeal the decision.

The Administrative Law Judge ("ALJ") found that both claimants had engaged in cash sales with French, which were not breached until December 1990 because French had, until then, led the claimants to believe they would be paid in full. The ALJ held that neither Minn.Stat. § 223.17 nor Department rules defined breach of a grain sale contract, but that under *In re Kern Grain Co.*, 369 N.W.2d 565 (Minn. App.1985), *pet. for rev. denied* (Minn. Aug. 29, 1985), French breached its contract only when he declared bankruptcy in December 1990, making it clear that he would not pay the claims. The ALJ ruled the claims were timely because Wallace and Quigley filed their claims that month.

On October 31, 1991, the Commissioner of Agriculture adopted in full the findings of fact and conclusions of law of the ALJ. The Commissioner ordered Auto–Owners to pay to the Department $9,186.62 for Quigley and $11,696.82 for Wallace.

## ISSUE

Did the Commissioner of Agriculture err by determining that buyer French breached his contracts for the sale of grain in December 1990, making the grain sellers' claims against the bond timely and entitling them to relief pursuant to Minn.Stat. § 223.17, subd. 7 (1990)?

## ANALYSIS

■ Because our decision here depends upon the interpretation of a statute, a legal question is presented and we are not bound by the decision of the agency. *St. Otto's Home v. Minnesota Dept. of Human Servs.*, 437 N.W.2d 35, 39–40 (Minn.1989).

■ 1. Where, as here, a bond is executed pursuant to statute, the statute must be considered in construing the bond. *Nichols v. Metropolitan Bank*, 468 N.W.2d 84 (Minn.App.1991), *pet. for rev. denied* (Minn. June 18, 1991).

■ The statutory provisions defining cash sales[1] and voluntary extensions of credit[2] do not clearly set forth the result when the buyer complies with the requirements of neither—and other provisions seem to point from one to the other. For example, Minn.Stat. § 223.17, subd. 5 (1990), seems to say that all sales, such as the sales here, that fail to meet the requirements for cash sales become voluntary extensions of credit. Such a result would, however, be contrary to the policy underlying the bonding requirement. The buyer's failure to comply with the requirements of both provisions cannot be held to destroy a seller's right to protection under the bonds, which apply only to sellers in cash transactions.

■ Further, Minn.Stat. § 223.177 (1990) specifies that contracts for voluntary extensions of credit must be in writing, must be provided to the seller before the close of the next business day, and must conform to the requirements of Minn.Stat. § 223.175 (1990). Minn.Stat. § 223.175 requires notice to the seller, in at least ten-point, all-capital type, that the seller is voluntarily extending credit and that, by doing so, he loses coverage under the grain buy-er's bond. Therefore, we hold that implicit in Minn.Stat. § 223.177, subd. 3,[3] is the proposition that all nonqualifying contracts, even if the seller offers credit, are to be treated as cash sales. It is irrelevant that the seller here allowed the buyer a grace period, because the buyer must give written confirmation of credit to the seller before the close of the next business day or the transaction fails as a credit sale.

2. If there is breach of a cash sale grain contract, Minn.Stat. § 223.17, subd. 7, requires a grain producer to file a claim with the Commissioner within 180 days of the breach in order to recover on the bond. Auto–Owners issued its bond on that basis.

The ALJ, Commissioner, and respondent assert that the claim here was timely, relying on *In re Kern Grain Co.* This case differs from *Kern,* however. In *Kern,* the bond company issued storage and sale bonds to Kern Grain Company ("Kern"), a public grain storage facility that stored farmers' crops for a fee. In *Kern,* the Commissioner found that all claimants had turned their grain over to Kern for open storage, rather than making cash sales or extensions of credit. *Kern,* 369 N.W.2d at 570–71. Also, the ALJ found that the

---

1. Minn.Stat. § 223.16, subd. 2a (1990), defines "cash sale" as:

   (a) a sale for which payment is tendered to the seller not later than the close of business on the next business day after the sale, either in cash or by check, or by mailing or wiring funds to the seller's account in the amount of at least 80 percent of the value of the grain at delivery; or

   (b) a sale of a shipment of grain which is part of a multiple shipment sale, for which a scale ticket clearly marked "CASH" has been received by the seller before completion of the entire sale, and for which payment is tendered in cash or by check not later than ten days after the sale of that shipment, except that when the entire sale is completed, payment is tendered in cash or by check not later than the close of business on the next business day, or within 48 hours, whichever is later.

2. Minn.Stat. § 223.16, subd. 16 (1990), defines "voluntary extension of credit contract" as

   a contract for the purchase of a specific amount of grain from a producer in which the title to the grain passes to the grain buyer upon delivery, but the price is to be determined or payment for the grain is to be made at a date later than the date of delivery of the grain to the grain buyer. Voluntary extension of credit contracts include deferred or delayed payment contracts, unpriced sales, no price established contracts, average pricing contracts, and all other contractual arrangements with the exception of cash sales and grain storage agreements evidenced by a grain warehouse receipt.

3. Minn.Stat. § 223.177, subd. 3 (1990), provides as follows:

   **Contracts reduced to writing.** A voluntary extension of credit contract must be reduced to writing by the grain buyer and mailed or given to the seller before the close of the next business day after the contract is entered into or, in the case of an oral or phone contract, after the written confirmation is received by the seller. Provided, however, that if a scale ticket has been received by the seller prior to the completion of the grain shipment, the contract must be reduced to writing within ten days after the sale, but not later than the close of the next business day after the completion of the entire sale. The form of the contract shall comply with the requirements of section 223.175.

*Kern* claimants did not know of the breach until the Kerns filed for bankruptcy because the Kerns soothed the anxiety of their customers who, as a result, thought, until the bankruptcy, that the Kerns would be able to buy and pay for the stored grain. *See id.* at 570.

Under Minn.Stat. § 223.16, subd. 2a (1990), if the parties engage in a cash sale, the seller must be paid immediately, that is, within one day. In this case, therefore, French breached the cash sale contracts at the end of the day after the sales. Claimants Wallace and Quigley did not file their claims within the statutorily defined time limit of 180 days thereafter, and are precluded from recovery.

## DECISION

We affirm the Commissioner's finding that the parties engaged in cash sales of grain. We reverse the Commissioner's conclusions of law, however, and deny recovery against the bond because claimants Wallace and Quigley did not timely file claims against relator, pursuant to Minn. Stat. § 223.17, subd. 7 (1990).

Reversed.

SHORT, Judge (concurring specially).

I concur in the majority opinion only insofar as it concludes the grain producers did not file timely claims with the Commissioner pursuant to Minn.Stat. § 223.17, subd. 7 (1990). I disagree with (a) the majority's analysis of Minn.Stat. § 223.177, subd. 3 (1990), and (b) its expansion of the term "cash sale" under the Grain Buyers' Act.